537 So.2d 888 (1989)
In the Matter of the CONSERVATORSHIP OF Estelle KENDRICK, Ward Gladys Stakelum
v.
HANCOCK BANK, Conservator of the Estate of Estelle Kendrick.
No. 58194.
Supreme Court of Mississippi.
January 25, 1989.
*889 Walter J. Phillips, Gex, Gex & Phillips, Bay St. Louis, Norman Breland, and John C. Ellis, Gulfport, for appellant.
Knox White, Robert J. Ariatti, Jr., William S. Boyd, III, White & Morse, Gulfport, for appellee.
Before DAN M. LEE, P.J., and PRATHER and SULLIVAN, JJ.
SULLIVAN, Justice, for the Court:
Gladys Stakelum appeals an order of the Chancery Court, First Judicial District of Harrison County, requiring that she marshall the assets and provide an accounting to the Hancock County Bank, Conservator of the estate of Estelle Kendrick. In particular, the order specifies an accounting of all assets belonging to the ward, Estelle Kendrick, in which Stakelum may have received any joint interest or survivorship interest within six months prior to the admission of the ward to Miramar Nursing Home in Pass Christian, Mississippi, on or about July 20, 1985.
The chancellor found, among other things, that Mrs. Stakelum had a confidential and fiduciary relationship with Mrs. Kendrick and that for a period of six months prior to Mrs. Kendrick's admission to a nursing facility on or about July 20, 1985, the ward was incompetent and lacked capacity to understand the nature and effect of the various instruments executed by her. The chancellor further found that because there was a confidential, fiduciary relationship between Mrs. Stakelum and Mrs. Kendrick, the appellee had established a prima facie case of undue influence. Hence, the various joint assets owned by the ward and obtained by Mrs. Stakelum within the said six months period were the result of undue influence.
Mrs. Stakelum has perfected this appeal and has assigned as error the lower court's adjudication on the issue of undue influence and the termination of her joint interest in the jointly held assets.
The facts establish that the ward, Estelle Kendrick, was an elderly woman approximately eighty years of age when she was admitted to a nursing facility on or about July 20, 1985. For approximately one year prior to her admission to the nursing home she lived with and was cared for by her niece, Gladys Stakelum, in Bay St. Louis. Prior to that time, Mrs. Kendrick resided in a house in New Orleans, Louisiana in which she owned one-half interest; the other half interest being that of the niece, Stakelum, who derived her interest from her parents.
Mrs. Kendrick came to live with Mrs. Stakelum sometime in 1984 following the death of her brother-in-law, Mrs. Stakelum's father. Mrs. Stakelum's father lived next door to Mrs. Kendrick and provided her with on-going assistance and care. Kendrick has for years suffered from a *890 degenerative and disabling respiratory and bone condition.
On April 2, 1985, Mrs. Stakelum took Mrs. Kendrick to an attorney's office in Covington, Louisiana, to prepare a special power of attorney to empower Stakelum to act as agent for Kendrick in the sale of the New Orleans house. After signing the power of attorney, Mrs. Kendrick agreed with Mrs. Stakelum to list the property with a real estate agent who was also the son of the attorney preparing said power of attorney. The following month the house sold and after expenses of sale Mrs. Kendrick and Mrs. Stakelum each received half of the proceeds, or $53,678.30. Immediately thereafter, on May 16, 1985, Mrs. Kendrick and Mrs. Stakelum opened a joint savings account at Peoples Federal Savings and Loan in Bay St. Louis. Mrs. Kendrick deposited her one-half proceeds from the sale of the New Orleans property into this account. None of Mrs. Stakelum's proceeds were deposited in this account. After some discussion among family members, on July 8, 1985, Mrs. Stakelum and Mrs. Kendrick opened another joint account with Dean Witter Reynolds in New Orleans. This joint account, which provided for full rights of survivorship, included $50,000 from the Peoples Federal Savings and Loan account in Bay St. Louis and $19,000 from another joint account between appellant and the ward at Homestead Security, an account opened by the ward and appellant in February of 1983 in New Orleans, Louisiana.
During the time of the sale of the New Orleans property and creation of the joint account, Mrs. Kendrick was beginning to have difficulty with her asthma condition, was becoming hyperactive, and was having trouble sleeping. At times, she would become confused.
Mrs. Stakelum took Mrs. Kendrick to their family doctor, Dr. Chevis, shortly after Kendrick moved to Bay St. Louis in 1984. He continued to care for Mrs. Kendrick during the next several months. By June of 1985, Mrs. Kendrick's physical condition had deteriorated to the point that Dr. Chevis determined she needed nursing home care. A local psychiatrist who examined Kendrick, Dr. Maggio, concurred with Dr. Chevis's opinion that Kendrick suffered from a degenerative organic brain syndrome. The prognosis was that Kendrick's declining mental condition was one of a gradual progressive type and she would not improve. The psychiatrist expressed his expert opinion that for a period of six months prior to his examination of Mrs. Kendrick in July of 1985, that she had memory deficits and was unable to exercise independent judgment.
Upon the concurrence of two additional physicians as to Kendrick's physical condition, she was admitted to Miramar Nursing Home on or about July 20, 1985. Several months later, in October, Mrs. Kendrick's adoptive niece, Mary Louise Paniello, brought an action to appoint a conservator for her aunt. Mrs. Stakelum joined in this petition and Hancock County Bank was appointed as conservator of Kendrick's estate.
It was at this point that Hancock County Bank requested Mrs. Stakelum to turn over all the assets of Mrs. Kendrick, including a copy of her will and all jointly held accounts. Mrs. Stakelum responded by petitioning the court to remove Hancock County Bank as conservator and requesting that she be appointed conservator. Mrs. Stakelum maintained that she should not have to relinquish her right of survivorship in the jointly held assets simply because Hancock County Bank's policy would not permit it to administer a conservatorship with jointly held assets. Stakelum maintains that she did not own the jointly held assets, that they in fact belong to the ward, but she wanted to retain the right of survivorship her aunt intended her to have.
We must examine the record to determine if there were sufficient facts in evidence to support the chancellor's findings.
This Court's standard of review regarding a chancellor's finding of fact recognizes that we must determine that the chancellor was manifestly wrong and against the overwhelming weight of evidence before we will reverse. Shaw v. Ladner, 447 So.2d 1272 (Miss. 1984). Where there is substantial *891 evidence to support the findings of the chancellor, we are without authority to disturb his conclusions, even though as an original matter he might have found otherwise. Jim Murphy & Associates, Inc. v. LeBleu, 511 So.2d 886 (Miss. 1987).
Upon examining the record we conclude the chancellor was not in error and had sufficient proof to conclude that Estelle Kendrick was mentally incapacitated during the six-month period prior to her admission to Miramar Nursing Home and was therefore incompetent and unable to understand or appreciate her actions during that time period. At least two physicians, Dr. Chevis and Dr. Maggio, testified to Mrs. Kendrick's degenerative brain disorder. Dr. Maggio, a psychiatrist, rendered his expert opinion and indicated Kendrick was incompetent during the six-month period immediately preceding her placement at Miramar.
The evidence to the contrary came primarily from Kendrick's family members and the attorney who prepared the power of attorney for use in the sale of the New Orleans house. No doubt the chancellor gave weight to their testimony and determined to the contrary.
Although it is obvious from the record there was a confidential, fiduciary relationship between Mrs. Stakelum and the ward, we do not reach the issue of undue influence. The test, here, rather is whether the ward had the mental capacity to understand the nature and effect of creating the joint interest at the time she did it. We conclude the chancellor had substantial evidence to support a finding that within six months of the ward's placement in Miramar Nursing Home she was incompetent.
We, therefore, determine that as to the joint assets, including but not limited to bank accounts and stocks, created within the six month period prior to the ward's admission to the nursing home are void and as to these assets the appellant will be required to marshall them for the conservator as ordered by the court below. As to any personal property of the ward in the possession of the appellant and received during the same said six-month period, this property shall also be marshalled for the conservator. As to personal property disposed of by the ward during the said six-months and not in the possession of the appellant, it is the responsibility of the conservator to marshall it.
Any joint assets created by the ward with the appellant prior to the same six-month period, such as the joint account at Homestead Savings & Loan in New Orleans, are presumed valid and the appellant is not required to relinquish her joint interest. If the conservator, Hancock County Bank, finds that it cannot administer the conservatorship with the valid joint assets due to a conflicting bank policy, it is certainly free to resign as conservator and allow another to be appointed.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, ANDERSON, and ZUCCARO, JJ., concur.
PITTMAN, J., not participating.