ISHEE, J.,
for the Court.
¶ 1. Clarence Beckley, the executor of the estate of Ladell Beckley, appeals from the decision of the Chancery Court of Pontotoc County awarding approximately thirty thousand dollars plus interest to Ladell’s brother, John Beckley. Clarence argues that the chancellor erred (1) by finding that the funds passed upon La-dell’s death to John as co-titleholder of a previously redeemed certificate of deposit in which the funds were once invested, and (2) by implicitly invalidating the durable power of attorney used by Ladell’s nephew, Larry Satterwhite, to redeem the certificate of deposit and implicitly rescinding the redemption transaction where the chancellor never expressly declared the power of attorney to be invalid and never expressly rescinded the redemption transaction.
¶2. We find that the chancellor’s fact-findings were supported by substantial evidence and that the chancellor correctly applied the law. Therefore, we affirm.
*714 FACTS
¶ 3. Ladell Beckley, a native Mississippian, returned to this state in the early nineteen-eighties to commence his retirement. Ladell moved to Pontotoc, Mississippi and lived near his nephew, Larry Satterwhite. In the late nineties, Ladell’s health began to fail, though he remained of sound mind. Satterwhite began caring for Ladell by tending to his health needs, providing his transportation, and performing errands for him.
¶4. While away from Mississippi, La-dell had fathered ten children. Ladell also had a younger brother, John Beckley, who lived in Joliet, Illinois at all times relevant to these proceedings. In September 2000, Ladell met with his attorney, Rhett Russell, and executed a will. In the will, Ladell bequeathed one hundred dollars each to two individuals unconcerned with this litigation, and left the residue of his property to five of his children, in equal shares. Ladell had saved approximately seventy thousand dollars which he had accumulated from his efforts during his lifetime. On October 18, 2000, Ladell purchased a certifícate of deposit from BancorpSouth bank in the amount of $28,699.79. This certificate of deposit was titled jointly in the name of “Ladell Beck-ley or John Beckley.” Under the heading “Account Ownership,” the certificate of deposit indicated that Ladell had requested a joint account with survivorship.
¶ 5. On March 8, 2001, Ladell purchased another certificate of deposit, this one in the approximate amount of $29,000. He titled this certificate of deposit in the name of himself or Satterwhite. In October 2001, Ladell’s health worsened, and Satter-white moved in with Ladell to provide more continuous care. On October 18, 2001, Ladell bought a third certificate of deposit in the amount of $10,000 and titled it in the name of himself or Satterwhite.
¶ 6. In January 2002, Ladell’s health declined further and he was admitted to a nursing home. On January 8, 2002, Ladell executed a durable power of attorney appointing Satterwhite as his attorney-in-fact. On January 14, 2002, Satterwhite, wielding the power of attorney, withdrew the funds from the certificate of deposit titled to Ladell Beckley or John Beckley and deposited these funds into another certificate of deposit in the name of Larry Satterwhite or John Beckley. On the same day, Satterwhite also withdrew the funds from the two certificates of deposit that he jointly held with Ladell. Satter-white used a portion of these funds to pay the balance of a loan of Ladell’s in the amount of $2,769.52. With the remainder of the funds, Satterwhite purchased two certificates of deposit in the amounts of $27,136.85 and $10,066.30. These certificates of deposit were titled in Satter-white’s name only.
¶ 7. Ladell’s health having improved, he left the nursing home sometime in January or February 2002. Ladell’s son, Clarence, visited him during the month of February. On February 4, 2002, Clarence drove La-dell to attorney Russell’s office. Russell testified that Ladell was frantic because his money had been taken from the bank without his permission. At Ladell’s request, Russell drafted a complaint against Satterwhite for the return of the funds. In the complaint, Ladell alleged that he was the exclusive owner of the certificates of deposit and that the certificates had been titled alternatively in the name of John or Satterwhite “for survivorship purposes only.” Ladell alleged that Satter-white had a fiduciary and confidential relationship with him and had presented him with the durable power of attorney at a time when Ladell could not read or understand the instrument. Ladell alleged that he had been unduly induced by Satter- *715 white to execute the instrument; in the alternative, Ladell stated that he hereby revoked the power of attorney. Ladell alleged that Satterwhite had withdrawn Ladell’s funds from BancorpSouth without his permission and also had taken some of his personal property. Ladell prayed for a preliminary injunction against Satter-white’s disposition of the funds, replevin of the personal property, an accounting, damages, and costs.
¶ 8. During this visit with Russell, Ladell also executed a second will. In this will, Ladell devised the residue of his estate in equal shares to his surviving children. On February 5, Ladell returned to Russell’s office and signed the complaint. The complaint was filed on February 7, 2002, initiating the instant lawsuit. Ladell passed away on March 1, 2002, and his will was admitted to probate on March 4, 2002. Clarence was named the executor of La-dell’s estate.
¶ 9. In mid-March, Clarence, John, Sat-terwhite and Russell met at Russell’s office to discuss the proper disposition of the funds from the certificates of deposit. They agreed that Satterwhite would withdraw the funds from the certificates of deposit and give them to Russell to be held in escrow pending the outcome of this litigation.[1]
¶ 10. On March 4, 2002, Clarence filed a motion, in his capacity as Executor of the Estate of Ladell Beckley, requesting that he be substituted as a party/plaintiff. On May 2, 2002, John filed a motion to intervene asserting his interest in the funds from the certificate of deposit that bore his name prior to Satterwhite’s redemption of that certificate of deposit. The chancery court granted both of the motions, and a trial was held on November 23-24, 2004.
¶ 11. On February 24, 2005, the chancellor entered an amended judgment finding that there was a presumption that Satterwhite had exercised undue influence over Ladell. The chancellor also found that the presumption of undue influence was not rebutted. Consequently, the chancellor determined that the funds should be put back into the certificates of deposit as they were before Satterwhite used the power of attorney. Furthermore, the chancellor found that there was no evidence that John exercised undue influence. The chancellor determined that if the certificates of deposit remained unchanged on Ladell’s death, John, as survivor, was entitled to the funds in his certificates of deposit. Therefore, the chancellor ordered that Russell deliver the proceeds of the October 18, 2000 certificate of deposit ($30,000) to John.
STANDARD OF REVIEW
¶ 12. On appeals from chancery court, we employ a limited standard of review. In re Estate of Carter, 912 So.2d 138, 143(¶ 18) (Miss.2005) (citing Miller v. Pannell, 815 So.2d 1117, 1119(¶ 9) (Miss.2002)). Our standard of review is indeed deferential, as we recognize that a chancellor, being the only one to hear the testimony of witnesses and observe their demean- or, is in the best position to judge their credibility. Id. (citing Culbreath v. Johnson, 427 So.2d 705, 708 (Miss.1983)). Thus, we will not disturb a chancellor’s *716 decision when supported by substantial credible evidence, unless the chancellor abused his discretion, was manifestly wrong or clearly erroneous, or applied an erroneous legal standard. Id. (citing Williams v. Williams, 843 So.2d 720, 722(¶ 10) (Miss.2003)).
ISSUES AND ANALYSIS
I. Whether the lower court erred in adjudicating funds of Ladell to have passed as of his death by survivor-ship to John as a co-titleholder of a previously redeemed certificate of deposit in which at one time such funds had been invested.
¶ 13. Clarence argues that the chancery court erred in finding that the 2000 certificate of deposit vested in John, as survivor, because the certificate of deposit was not a valid negotiable instrument at the time of Ladell’s death, as it was redeemed prior to his death. He further argues that the chancery court’s finding “ignores the fact that Ladell Beckley proceeded to the bank so as to redeem the certificate of deposit and reinvest the funds in question jointly into his name and the names of his children.” Moreover, citing Matter of Estate of Holloway, 515 So.2d 1217, 1223 (Miss.1987), Clarence argues that Ladell never completed an inter vivos gift of the funds in question to John, as Ladell neither intended to make the gift, nor relinquished all dominion and control of the funds. According to Clarence, John failed to prove by “clear and satisfactory proof each and every element requisite to constitute a valid inter vivos gift.”
¶ 14. First, with regard to Ladell’s intent to make an inter vivos gift, we note that the court in In re Estate of Holloway only analyzed whether the requirements of an inter vivos gift had been met because the certificates of deposit in that case bore no survivorship language. Id. at 1223. The Holloway court determined that where a certificate of deposit “bears facial or contractual indication of intended sur-vivorship, this expressed intent will be given effect.” Id. Furthermore, in Madden v. Rhodes, 626 So.2d 608, 616 (Miss.1993), the court found that “[t]he statutes of Mississippi have now abolished the need to prove ‘intent’ in determining ownership of joint accounts.” When a joint account is created, the intent to give ownership of the account to the person(s) named on the account is automatically presumed. Id.
¶ 15. In the case sub judice, the certifí-cate of deposit purchased by Ladell on October 18, 2000, was titled jointly in the name of “Ladell Beckley or John Beckley.” Under the heading “Account Ownership,” Ladell indicated that the certificate of deposit was to be jointly owned with surviv-orship. Given this express indication of survivorship, Clarence’s argument that John had the burden of proving that the requirements of an inter vivos gift had been met is without merit. Pursuant to Mississippi law, at Ladell’s death, John presumptively held title to the funds in the certificate of deposit that bore his name with survivorship, absent a showing of “forgery, fraud, duress, or an unrebutted presumption of undue influence.” Madden, 626 So.2d at 617.
¶ 16. Clarence also asserts that Ladell intended that the funds in question be transferred to Ladell’s children upon his death, as evidenced by the testimony of his children and the provisions of his will. In support of this argument, Clarence cites the testimony of two of Ladell’s children, Kay Terri Ellis and Clarence. Ellis testified that she had a conversation with her father during which he stated his desire to leave his children “something.” Ellis stated that the conversation took place in 2002, but she could not recall what time of year *717 it was or whether the conversation took place on the phone or in person. Clarence testified he drove his father to the bank on the day that he discovered that Satter-white had closed his accounts. He further testified that his father’s reason for going to the bank was to transfer the funds into his children’s names.
¶ 17. In addressing whether parol evidence may be used to determine Ladell’s intent, we turn to the case In Re Estate of Huddleston, 755 So.2d 435, 439(¶ 10) (Miss.Ct.App.1999). In Huddleston, this Court addressed whether funds placed by the decedent into a joint checking account and into certificates of deposit passed according to the joint tenant’s right of survivor-ship or whether the funds became part of the decedent’s estate. The proponents of the will argued that, although Mississippi Code Annotated section 81-5-63 (Rev. 1996) “expresses the presumption of intent of the maker of a jointly-held banking instrument to vest in the survivor, the statute does not negate previous will provisions which conflict with the banking instrument.” Id. at 439(¶ 7). The proponents of the will further argued that the decedent’s history, prior to executing the banking instruments, proved that she intended to divide her money among her children equally.
¶ 18. In Huddleston, this Court followed the general rule that “where a joint tenancy account in a bank is made payable to either depositor or survivor, the account passes to the survivor upon the death of a joint tenant.” Id. at (¶ 10) (quoting Strange v. Strange, 548 So.2d 1323, 1327 (Miss.1989)). The court further stated that “[wjithout doubt, our law allows competent adults to use such will substitutes with effect and thereby avoid probate.” Id. (quoting Cooper v. Crabb, 587 So.2d 236, 239 (Miss.1991)). Moreover, because of the common sense premises that “resurrecting the mind of the deceased and deciphering its thoughts four years after the fact is an enterprise fraught with hazard and not just because it is pursued by the self-interested,” the court determined that parol evidence may not be used to impeach an express survivorship clause. Id. at 440(¶ 12) (quoting Cooper, 587 So.2d at 241). Consequently, the Huddleston court found that parol evidence was inadmissible to show the decedent’s intent and that the funds represented by the banking instruments never became a part of the decedent’s estate. Id. at 440(¶ 13).
¶ 19. As in Huddleston, we decline to use the testimony of the self-interested to decipher the mind of the deceased. We find that the express language of the certificate of deposit is the most reliable evidence of Ladell’s intent. Therefore, this issue is without merit.
II. Whether the lower court erred in invalidating the power of attorney obtained by Satterwhite from La-dell and in rescinding the transaction whereby the power of attorney was utilized by Satterwhite to redeem the 2000 certificate of deposit in the face of Ladell as principal under the terms of such power of attorney having neither declared such instrument to be invalid nor rescinded the redemption transaction.
¶ 20. Under this assignment of error, Clarence does not take issue with the chancery court’s finding that Satterwhite obtained the power of attorney from La-dell through undue influence; he admits in his brief to this Court that the chancery court’s finding on this issue was correct. Nonetheless, Clarence asserts that the chancery court did not have the authority to void and set aside the power of attorney. Citing McKinney v. King, 498 So.2d *718 387, 388 (Miss.1986), Clarence asserts that the power of attorney may have only been set aside by Ladell, as principal, or his estate.
¶ 21. In McKinney, after the decedent was diagnosed with cancer, he executed a will leaving his house to his wife and his daughter from a previous marriage, and he gave his wife use of the house for as long as she resided in it as a widow. Id. The decedent also executed a power of attorney in favor of his wife. Id. After obtaining the power of attorney, the wife executed a warranty deed on the house to herself and the decedent as joint tenants with right of survivorship. Id. The chancery court determined that a confidential relationship existed between the decedent and his wife; consequently, the court cancelled and set aside the warranty deed. Id. The Mississippi Supreme Court affirmed the chancery court’s decision. Id. at 389.
¶ 22. In the case at bar, as a result of finding the existence of a confidential relationship and an unrebutted presumption of undue influence, the court invalidated the power of attorney and set aside Satter-white’s redemption of the 2000 certificate of deposit. The court determined that the redemption was only made possible through the use of undue influence in obtaining the power of attorney. Thus, in McKinney, as in the case sub judice, when the chancery court found that the confidential relationship was violated, the court cancelled and set aside the transaction that was accomplished by using the power of attorney. We see no reason to depart from the logic of McKinney. Therefore, this issue is without merit.
¶ 23. THE JUDGMENT OF THE CHANCERY COURT OF PONTOTOC COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ. AND BARNES, J., CONCUR. CHANDLER, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY SOUTHWICK, IRVING, GRIFFIS, AND ROBERTS, JJ.

. Satterwhite testified that they agreed that he would give up the funds in exchange for an agreement to drop criminal charges against him. He further testified that they agreed that he would keep the approximately ten thousand dollar certificate of deposit but would relinquish the funds from the other two certificates of deposit! The estate disputes this agreement 'and avers- that Satterwhite owes the estate the ten thousand dollars. Sat-terwhite did not pay over the ten thousand dollars in March 2002 and testified that he spent it.